BOOKE & OLSON, co-partners, Appellants, v. JOHN BARTON PAYNE, as Agent of the President of the United States, Respondent.

(184 N. W. 803.)

**Carriers — when furnishing facilities and utilites for reception of cattle carrier must have same suitable and reasonably safe.**

1. It is the duty of a carrier, as an incident to its business of

transporting livestock, when it tenders facilities and utilities for the reception of cattle preparatory to shipment, to furnish the same in a suitable and reasonably safe condition.

**Carriers — carrier's breach of duty and contributory negligence as to stock lost in wandering into reservoir before shipment held for the jury.**

2. Where a carrier maintains stockyards and also a plot of ground upon which cattle are customarily held preparatory to shipment and, where prospective shippers are directed by the carrier to feed, water and hold their cattle upon such plot of ground preparatory to and while waiting shipment by reason of occupancy of the stockyards, and where, while there, 60 head of cattle wander through unprotected openings in small banks of an artificial reservoir there maintained by the carrier, and off steep banks into an open space of thin ice and deep water, occasioning the loss of 44 head, it is *held* that the carrier's breach of duty and the shippers contributory negligence were questions of fact for the jury.

Opinion filed Oct. 5, 1921. Rehearing denied Oct. 29, 1921.

Action in District Court, Stark County, *Crawford, J.*

From an order granting judgment notwithstanding the verdict, the plaintiffs have appealed.

Reversed and judgment ordered upon the verdict.

*Simpson & Mackoff,* and *S. Pomerance,* for appellant.

*Young, Conmy & Young,* for respondent.

### *Statement*

Bronson, J. This is an action against a common carrier to recover damages for negligence resulting in the loss of some 44 head of live stock. Upon trial, the jury returned a verdict in favor of the plaintiff for $2,640. Thereafter the trial court, upon motion made, ordered judgment notwithstanding the verdict for the defendant. From the judgment entered accordingly, and from the orders made therefor, the plaintiffs have appealed. The record discloses evidence as follows:

In November, 1919, the plaintiffs, as co-partners, were engaged in the cattle business and were operating a ranch some 25 miles south of Belfield. On November 15, 1919, they made written order for six cars

to the defendant carrier, then under federal control, for the shipment of cattle from Belfield, N. D., to Steele, N. D., to be furnished on November 25, 1919. On that day they called, over the telephone, the agent of the carrier at Belfield. They were advised that the cars were there. They told the agent that they would be there upon the 28th. The agent responded that this would be all right. On November 26, 1919, the plaintiffs, with two assistants, left the ranch with some 260 cattle. During the first two days they approached within 2½ miles of Belfield. On the morning of the third day, between 9 and 10 (November 28th), they arrived at Belfield. The railway facilities at Belfield for receiving and loading cattle consisted of stock pens and chutes along the right of way adjacent to the track. There was one large pen, having a capacity of about 100 head, for mixed cattle, and smaller pens. In the whole stockyards there could be placed and fed therein properly between 150 and 200 head of cattle. In order to drive into the smaller pens, it was necessary to drive through the large pen. Connected with these pens are two loading chutes. On the morning when the plaintiffs arrived there were 56 head of horses in the main pen of this stockyard. They had been placed there by the owner, one Mullaney, about 8 a. m. of that day, and remained there throughout the day, excepting about 10 head, cut out in the afternoon. South of these stockyards and of the right of way the defendant carrier owned a considerable strip of land adjacent to the right of way, extending eastward some 1,000 feet to the townsite. Upon this strip and partly upon the right of way, eastward of these stockyards some 700 feet, it had constructed, and for several years had maintained, a reservoir for purposes of securing water for locomotives, etc. This reservoir was 648 feet long, 130 feet wide, and about 16 feet deep. It extends north and south; the north end being some 100 feet from the main railway track. The dirt excavated was thrown upon the sides about, forming so-termed "spoil banks" 14 to 15 feet high. At the southern end there were two openings between these "spoil banks," one where an inlet of a natural creek exists, and the other at the southwesterly corner. At the north end there are likewise two openings, one for an outlet or overflow into this natural creek, some 20 feet in width, the other a smaller opening on the north side.

These openings at the north end are upon the railway right of way. The "spoil banks" set back so that there are about 5 feet of natural ground between them and the banks of the reservoir. The

banks are constructed upon a 1 to 1 slope. The land about this reservoir is open ground. It was the custom for people who had live stock for shipment, awaiting shipment, to graze and hold them on the particular railway lands southeast of the reservoir. Likewise the agent of the carrier admitted, although otherwise testifying, that it was customary to put cattle brought in for shipment in the stockyards. When the plaintiffs came with their cattle near the stockyards they discovered the horses therein. The day was cold, about 15 degrees below, with a cold breeze from the northwest. It had been cold for several days. There was not room for all of their cattle in the yards. One of the plaintiffs saw the agent. He advised them that the cattle were there, that they wanted to ship out, and that there were horses in the corral. Thus he testified:

"Well he (the agent) says to keep them over there handy and just pointed out. He says to keep them handy; that he thought along about 12 or 1 o'clock there would be an engine along to load us." "I wanted to know where to go. It was a cold day. If I could have got them in the corral there would be some shelter, that shed on the west away from the wind; and he said to keep them over handy, so I took them right on the south just about where he directed me; on the southeast corner of the reservoir, there are some high dirt piles." "Just about where he pointed to keep them handy."

Then he testified that he took the stock over to the place where he was directed; that the agent told him to take the cattle over on the east side of the reservoir where that little creek was and water them; that he could get water there and also there was a little shelter from the dirt piles; that then they proceeded to purchase hay, to dump it on the ground against the reservoir, and to feed it to the cattle; that they found water in this creek against the reservoir. They cut holes in the ice in several places so that the cattle could eat, walk down, and drink also. The ice on this creek was about one foot thick. The water in this creek in some places was two or three feet deep. They saw the openings in the "spoil banks" in the southeast and southwest corners because they went that way and were right near. There were four of them in charge of the stock until about the dinner hour. Then three of them, leaving one La Due, a boy 16 or 17 years old, in charge, proceeded on horseback to town for dinner. The cattle were about four blocks west of Main street, about 30 or 40 rods from the main part of town, as one of the

plaintiffs testified. They were gone about 20 minutes or so. On their way back from dinner they met La Due, proceeding on foot for his dinner. One of them hollered that something was wrong with the cattle; they went to the north end of the reservoir and discovered that some 60 head of cattle had gone through the opening there, and were in the water at the north end from the bank for a distance of 30 feet or so. Two boys, witnesses for the defendant, testified that the cattle went through the opening between the "spoil banks" at the northeast corner, the overflow outlet. Help was summoned, and after some three hours effort the cattle were extricated from the water. Six were then dead; others died during the day. The cattle remaining were shipped to Steele on the following day. More of the inundated cattle perished, although given good care. In all, 44 were lost. These openings at the north end of the reservoir were not protected by any fence or barriers. They were situated upon the railway right of way. Prior to the loss of the cattle the plaintiffs did not know of these openings. Then (November 28, 1919), the reservoir was well covered with thick ice, excepting at this place where the cattle got in the water. There, as one witness testified, he never saw the water frozen over completely. He had lived about 300 feet from the reservoir for three or four years, and had helped pull out these cattle. Another witness who assisted in taking out the cattle testified that the water in the reservoir freezes to the ordinary depth of water in creeks and open watering places in that locality, excepting that the northeast corner does not freeze as hard; that there was a thin scum of ice over that particular portion; that he thinks perhaps they tapped a spring, in constructing the reservoir, that came from the little stream there. He was familiar with the ground before the construction of the reservoir, and he remembers a large spring formerly to the north of the reservoir. The plaintiffs testified that there was not much ice where the cattle fell in the water, and that it was not possible for them to crawl out of such place.

The plaintiffs, in their pleadings and contentions upon the record, have predicated negligence of the carrier through its failure to have proper room and place for receiving and loading the stock, in directing and permitting the stock to be held in the vicinity of the reservoir, and in failing to properly safeguard the reservoir and the place where the cattle were held.

*Decision*

The evidence in the record favorable to the plaintiffs has been so stated for the reason that the issues of fact involved have been determined by the verdict of the jury adversely to the testimony favorable to the carrier. First State Bank v. Kelly, 30 N. D. 84, 98, 152 N. W. 125, Ann. Cas. 1917D, 1044; Dubs v. Nor. Pac., 171 N. W. 888; Jackson v. Grand Forks, 24 N. D. 617, 140 N. W. 718, 45 L. R. A. (N. S.) 75.

The general rule undoubtedly is that it is the duty of the carrier, as an incident to the business of transporting cattle, to furnish suitable stockyards for receiving and delivering such cattle both at the point of shipment and of destination. 10 C. J. 79, and cases cited; Hutchinson on Carriers (3d ed.) § 510. As Justice Harlan stated in Covington Stockyard Co. v. Keith, 139 U. S. 128, 11 Sup. Ct. 461, 35 L. ed. 73:

"When animals are offered to a carrier of live stock to be transported it is its duty to receive them; and that duty cannot be efficiently discharged, at least in a town or city, without the aid of yards in which the stock offered for shipment can be received and handled with safety and without inconvenience to the public while being loaded upon the cars in which they are to be transported." "In other words, the duty to receive, transport and deliver live stock will not be fully discharged, unless the carrier makes such provision, at the place of loading, as will enable it to properly receive and load the stock, and such provision, at the place of unloading, as will enable it to properly deliver the stock to the consignee."

In Zakrazewski v. G. N. Ry., 125 Minn. 125, 145 N. W. 801, 802, it is stated:

"There ought to be no doubt upon the proposition that, at those shipping points of a common carrier where stock pens or yards are reasonably necessary, the duty rests upon the carrier to furnish the same in such condition and with such facilities for handling and caring for stock that the shipper can, with a reasonable degree of safety and convenience, assemble and attend to the wants of the animals so that when loaded they are in a fit condition to stand the hardships of the journey."

See Id. 131 Minn. 175, 154 N. W. 966; St. Louis & San Francisco Ry. v. Beets, 75 Kan. 295, 89 Pac. 683, 10 L. R. A. (N. S.) 571; Ft. Worth & G. R. Ry. v. Galton, 45 Tex. Civ. App. 67, 100 S. W. 166.

This duty attaches although the control and management of the stock remain entirely with the shipper until loading begins. Zakrzewski v. G. N. Ry., supra.

Upon this record the questions presented are (1) whether, as a matter of law, the carrier was free from negligence in the performance of this duty stated, and (2) whether, as a matter of law, the plaintiffs were guilty of contributory negligence.

The carrier contends that the carrier did not invite the plaintiffs to turn their cattle loose without a herder or to use the reservoir to water their cattle; that in permitting the cattle to get in the reservoir and using a portion of the carrier's premises where they were not invited the plaintiffs were trespassers or at best mere licensees. It further maintains that there is no proof that the carrier invited or directed the plaintiffs to use this particular spot adjoining the reservoir for holding the stock, and that the failure to fence the reservoir was not negligence.

Does the record sustain the contentions of the carrier, as a matter of law? The answer must be considered in connection with the duty of the carrier in the receiving of cattle for shipment. The carrier has neither considered nor discussed this duty. The negligence of the carrier does not turn upon the question whether the plaintiffs were licensees or invitees, as such, but rather upon the question whether the facilities and utilities tendered to the plaintiffs for the reception of the cattle preparatory to, and while awaiting, shipment, were furnished pursuant to its duty.

It is undisputed that the carrier did recognize the necessity of maintaining facilities and utilities at Belfield for the receiving of cattle prior to and while waiting shipment. It is admitted that the carrier did maintain there stockyards for such purpose. It is further undisputed that cattle were customarily held upon this plot of ground where the reservoir is situated preparatory to, and while waiting, shipment. There is evidence in the record that on November 28, 1919, the stockyards were not available for the use of the plaintiffs. There is further direct evidence that the agent of the carrier directed the plaintiffs to hold, feed, and water their cattle near the reservoir both for purposes of shelter and for water, all preparatory to and while waiting shipment.

The reservoir was an artificial creation. The water therein was deep; the banks were steep, almost precipitous. The "spoil banks," serv-

ing as a protection and barrier, also perhaps were a snare by reason of the unguarded and nonwarning openings through them. The water at a certain place in the north end remained unfrozen, or with a thin coating of ice, in cold weather, and so existed when the cattle were drowned. There is evidence, although disputed, to that effect. If this reservoir were within the confines of the stockyards proper with no further protection than existed upon the adjacent ground of the carrier, it surely might not be said, as a matter of law, that the carrier had fulfilled its entire duty in providing for the receiving of cattle, if they should be drowned or be killed, as they were in this case. The question of the breach of this duty by the carrier must be similarly considered, although such reservoir was situated without the stockyards proper, if the facts warrant consideration by the jury of this duty. If the plaintiffs were directed and permitted by the carrier to take, hold, feed, and water these cattle near the reservoir, where they were by reason of the yards then being occupied and insufficient to contain plaintiffs' proposed shipment, if the reservoir, by reason of its proximity, the unguarded openings, and the open place in its water surface, was a dangerous utility to be so maintained at such place where such cattle were received and held for shipment, then, through loss resulting by reason thereof, a jury might find a breach of this duty of the carrier. Upon this record we are of the opinion that sufficient facts were presented to make this breach of duty a question of fact for the jury, and that the verdict of the jury determining the negligence of the carrier in that regard should not be disturbed. See L. R. A. 1918C, 540; Heckman v. Evenson, 7 N. D. 173, 182, 73 N. W. 427.

The carrier contends that the record discloses contributory negligence on the part of the plaintiffs; that the cattle were simply permitted to wander wild as they willed. In this connection a close question is presented, as a matter of law. The evidence is far from satisfactory in explaining how the cattle happened to get in the reservoir, whether during the presence of the herder or his temporary absence. There is evidence, however, that the plaintiffs did not know about these open and unguarded openings between the "spoil banks" in the north end; that they knew nothing about the open place in the water where the cattle were drowned. The plaintiffs were directed and permitted to hold, feed, and water their cattle near these openings. The openings, unguarded and not protected, were dangerous for cattle by reason of the open water

place within the reservoir. If the ice upon the reservoir had been uniformly thick, like upon the creek without, a foot in thickness, and if there had been no open nor dangerous water hole within, little danger would have existed if the cattle should wander through such openings and upon the reservoir.

The unguarded openings and the open water space, concerning both of which the plaintiffs neither were informed nor knew, constituted the menace of danger and of injury. Reasonable men might draw different conclusions from the evidence as to whether the plaintiffs would have known or investigated concerning the reservoir or should have more closely attended the cattle. Contributory negligence may not be charged to the plaintiffs because they accepted the facilities offered by the carrier. Lackland v. Ry. Co., 101 Mo. App. 420, 74 S. W. 505. The question of contributory negligence therefore was primarily one for the consideration of the jury, and its findings should not be disturbed. Jackson v. Grand Forks, 24 N. D. 601, 617, 140 N. W. 718, 45 L. R. A. (N. S.) 75; Haugo v. G. N. Ry., 27 N. D. 268, 273, 145 N. W. 1053; Overpeck v. Rapid City, 14 S. D. 507, 85 N. W. 990, 992.

The order is reversed, and judgment ordered upon the verdict, with costs.

GRACE, C. J., and ROBINSON, CHRISTIANSON, and BIRDZELL, JJ., concur.